TAYLOR v. COBB.

No. 33594. Jan. 24, 1950.

*214 P. 2d 233.*

372

McMahan & Loofbourrow, of Boise City, and Rizley, Tryon & Sweet, of Guymon, for plaintiff in error.

Hughes, Ogden & Ogden, of Guymon, for defendant in error.

O'NEAL, J. This is an appeal from a judgment in favor of defendant in error, V. C. Cobb, against plaintiff in error, Joe Taylor, in an action to recover a broker's commission on the sale of real property. The parties will be referred to as plaintiff and defendant, as in the trial court.

Plaintiff is a broker engaged in the business of buying and selling real estate on commission.

On and prior to February, 1947, defendant was the owner of a section of land in Cimarron county, Okla., being section 28, township 1 north, range 7, E.C.M., and had advertised the same for sale in a local newspaper.

Plaintiff, having learned that the defendant desired to sell said land, met defendant and entered into negotiations with him, out of which this action arose.

Plaintiff asserts that he entered into an oral agreement with defendant, whereby it was agreed that defendant was to list the land with plaintiff and plaintiff was to endeavor to sell same for defendant, and if he did sell the same, plaintiff was to receive as his commission all that plaintiff could get for said land over and above the sum of $22 per acre, and that for any sale plaintiff should make, defendant was to receive net to him $22 per acre; that thereafter, on or about March 15th, plaintiff procured a purchaser for said land in the person of one Clarence Weeks who agreed to buy said land and was ready, willing and able to, and did agree to buy said land at and for the sum of $23.50 per acre; that thereupon plaintiff informed defendant that he had a purchaser who was ready to sign a contract for the sum of $23.50 per acre; that defendant informed plaintiff that he would come to Guymon, Okla., in a few days and complete the deal; that defendant failed to do so, and a few days later, when called upon by the purchaser, Clarence Weeks, defendant declined to complete the transaction and stated that he would not sell the land for less than $25 per acre net to him; that thereby plaintiff earned his commission in the sum of $960, payment of which he demanded from defendant, and defendant refused to pay. Thereupon this action was commenced by plaintiff, alleging, in substance, the above facts. Defendant answered by general denial.

The issues were tried to a jury, resulting in a judgment and verdict for plaintiff in the sum of $640, and defendant appeals.

Assignment of error No. 1 is that the court erred in overruling defendant's motion for new trial.

Assignments Nos. 2, 3 and 4 go to the sufficiency of the evidence.

Assignment No. 5 is that the court erred in giving instructions Nos. 1 and 2.

Assignment No. 6 is that the court erred in refusing to give defendant's requested instruction No. 3.

All the assignments of error are presented under four propositions. Prop-

ositions Nos. 1 and 2 are presented together and are: (1) The court erred in overruling defendant's demurrer to plaintiff's evidence presented at the close of plaintiff's case in chief, and again presented at the close of all evidence; and (2) the verdict and judgment are contrary to the evidence and the law.

It is first contended that the court erred in overruling defendant's demurrer to plaintiff's evidence upon five different grounds.

The first reason, defendant contends, there was no valid contract of employment in that the minds of the parties did not meet on terms of the sale, and that the listing contract claimed by plaintiff was indefinite and uncertain in its terms, and left matters for further negotiation. These matters go to the validity of the alleged contract of employment between plaintiff and defendant and require examination of the evidence on that question. There is conflict in the evidence as to what was said between the plaintiffs and defendants at the time the alleged contract was entered into. It is agreed that they met sometime about February 6 to February 15, 1947, at a service station in the small town of Kerrick, Tex., where negotiations were entered into.

If the evidence of plaintiff is to be taken as true, there was an apparently valid agreement between plaintiff as a broker and defendant as an owner.

If the evidence of defendant is to be taken as true, there were no definite and final terms under which plaintiff was authorized to sell the land.

Plaintiff testified, in substance, that sometime about February 15, 1947, he had learned that defendant Taylor had a section of land for sale, and that on or about February 15, 1947, plaintiff was in the town of Kerrick, Tex., and learned that Taylor was at a service station in said town. Plaintiff went to the filling station and inquired for Mr. Taylor and defendant answered and stated that his name was Taylor; that

plaintiff introduced himself and told Taylor his name, his business, and that he lived at Guymon Okla.; that he inquired of defendant whether he had some land for sale and defendant told him that he did and that plaintiff told defendant that he would like to see the land; that they went together in a car and looked at the land, and after they got back to the service station the following conversation took place:

" 'Well', I said, 'Mr. Taylor, what do you want for your land?' 'I want $22 an acre', he said. 'Well', I said, 'will you pay the regular five per cent commission?' 'No, I won't. I want that net to me'. 'How do you want to sell this land' 'Well', he said, 'I don't want all of this money. I would like to have half of it now and half of it next year, and that there was a loan already against it', I believe he said . . ."

Plaintiff testified further that defendant told him that there was a mortgage against the land in favor of the State School Land Commission upon which there was unpaid the sum of approximately $5,000; that the purchaser would be required to assume the mortgage and that the purchaser would be required to pay interest on the deferred payment at the rate of 6 per cent per annum; that defendant wanted $22 per acre net to him and that plaintiff would have to get his commission above that; that defendant wanted half cash over and above the mortgage and the other half to be paid the next year, and that there was nothing said at the time about taking a second mortgage back on the land to secure the deferred payment. In all this plaintiff was corroborated by his son, Lee Cobb, who was with plaintiff and defendant when they went to look at the land, except that the son did not remember about what was said as to the rate of interest on the deferred payment.

Plaintiff further testified that he showed the land to three propspective purchasers, the last of which was Clarence Weeks; that on or about March 15, 1947, he showed Weeks the land

and priced it to him at $23.50 per acre and told him that there was a mortgage of approximately $5,000 against the land and that the purchaser would be required to assume that mortgage and would be required to pay in cash one-half of the sale price over and above the mortgage, and pay the other half the next year, and would be required to pay 6 per cent interest on the deferred payment; that Weeks agreed to buy the land at that price and on those terms and that plaintiff went to see defendant the next day and informed him that he had the land sold; that defendant told him that he had the land rented and that plaintiff replied that that would be all right because the buyer did not intend to farm the land himself; that defendant then asked plaintiff how the buyer was going to pay for the land and that plaintiff told him the buyer would pay for the land just like defendant wanted to sell it; that is, one-half cash and one-half at any time after the first of next year; that thereupon defendant replied that he would not take a second mortgage on the land and that was the first that had been said about the second mortgage. He testified further that he told defendant that Weeks had agreed to pay one-half cash or that he would pay all cash if defendant wanted it; that defendant then told plaintiff that he would come over to Guymon on Tuesday or Wednesday of the next week and go ahead with the deal.

Clarence Weeks testified, in substance, that plaintiff showed him the land about March 15, 1947, and priced it to him at $23.50 per acre; that he did not decide at the time whether he would take the land, but later that day, or a day or two later, he decided that he would take the land and so informed Mr. Cobb; that Mr. Cobb had told him about the mortgage on the land and that Mr. Taylor wanted to sell it in such a way as to break up or split the income tax payments, and did not want all his payment in cash. Weeks further testified that Cobb did not tell him just how much cash had to be paid, but it was agreeable to him, Weeks, to split up the payments, but that he was in a position to secure, outside the land itself, any deferred payment; that he owned 640 acres of land clear of encumbrances and that he also had bonds in the bank. He further testified that after he told Cobb that he would take the land on the terms stated, Cobb informed him that he would go out and see Mr. Taylor and have him come in and sign up a contract; that a few days later Cobb informed . him that Taylor had told him that the land was off the market, and that he did not care to sell it; that a few days later he, Weeks, went to see defendant, Taylor, himself about the matter and that defendant told him that he had decided not to sell the land through the man at Guymon (Mr. Cobb); that he then informed defendant that he was the man who was on the deal to buy the land through Mr. Cobb. Thereupon defendant told him something about reducing his tax and that he would go ahead and sell the land and that he had decided to keep the land. Weeks further testified that he was ready, willing and able to buy the land at the price and under the terms offered by Mr. Cobb.

Defendant, Taylor, testified, in substance, that he met Mr. Cobb at the service station, substantially as Mr. Cobb had testified, except that Mr. Cobb did not tell him his name; that Cobb inquired of him whether he had some land for sale and he informed Cobb that he did; that he there told Cobb that if he, Cobb, was interested in the land he would be glad to show it to him, and that thereafter they got into a car and went and looked at the land; that Cobb did not tell him that he was a real estate broker until they returned to the service station; that defendant priced the land to Cobb at $22 per acre; that Cobb then asked him that if he sold the land that defendant pay him a commission; that he informed Cobb that he would not pay the usual 5 per cent commission;

that Mr. Cobb told him that he thought he had a man who would be interested and that he would show him the land within a week; that he told Mr. Cobb that he would not pay a commission out of the $22 per acre, but that he would have to get his commission over and above that, and that he, defendant, had to have $22 per acre net to him; that he told Cobb there was a mortgage against the land and he would like to sell it in a way that he would not have to pay too much income tax; that he did not tell Cobb that he wanted one-half down and one-half the next year and that they did not discuss what the payments would be over and above the mortgage, or how long the deferred payments should run and nothing whatever was said about the rate of interest. He testified further that he did not again see Cobb until sometime about the 28th of March, when Cobb came to his place and stated:

". . . Mr. Taylor, I have a proposition I think that would suit you on account of what you said about your income tax. These are the exact words: 'I have a man that will consume that mortgage of five thousand dollars and will pay thirty-eight hundred dollars down and will give you a second mortgage on this place to secure the rest of this money and pay it the first of February '48'. Q. What did you say to him in regards to that? A. I told him that I didn't want a second mortgage on this place and that I had rented it and it was off the market. Q. Did he make any reply to that? A. He says I wished you had told me if you wasn't going to sell the place. I wished you had let me known that you went out of the notion of selling the place. Q. What did you say? A. I told him that I wanted any obligations to him to set at— Q. Did you know his name? A. No, sir, I don't know his name. Q. I believe in this conversation he didn't mention who the prospective purchaser was? A. No, sir. Q. You've had no further conversation with Mr. Cobb? A. I haven't spoke to him till then till now."

He testified that Cobb told him that Weeks could give security if he wanted it and that Mr. Weeks told him the same thing when he was out to see him a few days later, and that Weeks also told him that if defendant wanted to he believed he could get the money and pay the whole thing; he denied that he told Cobb that he would come to Guymon the following week and close the deal with Weeks. He testified further that there was some conversation with Weeks about the sale of the land in question, together with the half section of land owned by defendant, Taylor's, son and that he, Taylor, did tell Weeks that he might come in and close a deal for such a sale if it could be arranged, but that his son did not care to sell the land and nothing came of that transaction.

On cross-examination defendant testified, in part:

"Q. You wanted to sell it then, didn't you? A. Yes, sir. Q. And you wanted $22 an acre for it? A. Yes, sir. Q. And Mr. Cobb, did he tell you he was interested in it? A. Yes, sir. Q. He told you that he was a real estate broker? A. Not then. Q. He did later? A. He did later. Q. That he didn't want it for himself? A. I didn't know until after I had shown him the place. Q. And you told him that he might sell it for $22 an acre? A. That's right. Q. And that was satisfactory to you? A. That's right."

The conflicting evidence on the terms of the alleged contract or agreement presented a question of fact for the jury to determine.

The rule is that where land is listed for sale with a broker, and the broker finds a purchaser who is ready, willing and able to buy the land on the terms it has been listed with the broker, and the owner refuses to comply with his contract, the broker has earned his commission. 8 Am. Jur., Brokers, §173, p. 1090.

The question was submitted to the jury under proper instructions under conflicting evidence as to the terms of the contract. The jury by its verdict decided the issue in favor of the plaintiff.

The contention is that the court erred in giving instructions Nos. 1 and 2. Examination of the instructions complained of will disclose that they fairly stated the applicable law and there is no error therein. The law covered by defendant's requested instruction No. 3 was covered by the instructions given by the court and there was no error in refusing said requested instruction.

Affirmed.